UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
SHAILENDRA GHORPADE,                         :
                             Plaintiff,  :
:      14-CV-4379 (JPO)
                -v-                       :
:      OPINION AND ORDER
METLIFE, INC. and METLIFE GROUP, INC.,       :
                          Defendants.  :
:
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiff Shailendra Ghorpade brought this action against Defendants MetLife, Inc. and MetLife Group, Inc. (together, "MetLife"), alleging that MetLife wrongfully discriminated against him because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and that MetLife wrongfully terminated him in violation of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* MetLife moves for summary judgment on Ghorpade's claims. For the reasons that follow, MetLife's motion is granted.

**I.    Background**

      The following facts are undisputed unless otherwise noted. Ghorpade, who was born in 1953, began his employment with MetLife in 1997. (Dkt. No. 62 ¶ 1; Dkt. No. 63-39.) Beginning in 2007, Ghorpade was based in London, serving as Regional Executive of Europe. As part of that role, he served as the non-executive chairman of MetLife's India business. (Dkt. No. 62 ¶¶ 2, 4.)

      In 2011, MetLife restructured its international business into three regions: (1) the Americas; (2) Europe, the Middle East, and Africa ("EMEA"); and (3) Asia. (*Id.* ¶¶ 7, 10.)

1

Michael Khalaf was named President of the EMEA region, while a search began to fill the role of President of the Asia region. (*Id.* ¶¶ 12-13.) Beginning in November 2011, Ghorpade reported to Khalaf. (*Id.* ¶ 14.)

In January 2012, Khalaf asked Ghorpade to move to India and assume a role that focused on overseeing MetLife's India business. (*Id.* ¶¶ 18-19.) At that time, Rajesh Relan was the CEO of MetLife India. (*Id.* ¶¶ 21-22, 38.) Relan reported to SV Rangan, an executive located in London, who in turn reported to Ghorpade. (*Id.* ¶ 23.) Ghorpade accepted the assignment in India and started the new role in early 2012. (*Id.* ¶ 32.)

In August 2012, MetLife hired Christopher Townsend as President of its Asia region and in November the India business moved from the EMEA region to the Asia region. (*Id.* ¶¶ 42-43.) As a result, Townsend replaced Khalaf as Ghorpade's manager. (*Id.* ¶ 44.)

Having supervised Ghorpade for the majority of 2012, Khalaf completed a draft of Ghorpade's 2012 performance review. (*Id.* ¶¶ 45, 46.) Khalaf rated Ghorpade as "Not Fully Contributing"—the lowest possible performance rating. (*Id.* ¶¶ 48-49.) The evaluation detailed that MetLife India's "[s]ales performance fell significantly short" and that "management must take responsibility given the magnitude and extent of the negative variance" below expectations. (*Id.* ¶ 51; Dkt. No. 55-7.) It stated that there was evidence of "a lack of adequate oversight and governance (driven by a hands off approach) and this must be addressed going forward." (Dkt. No. 55-7 at 49.) It also noted that it had been "difficult to obtain complete, accurate and reliable information out of India." (*Id.*) Townsend ultimately adopted Khalaf's comments and his recommended rating. (Dkt. No. 62 ¶ 61.)

Townsend, as Ghorpade's direct manager, was responsible for determining whether Ghorpade would receive a bonus or Long Term Incentive ("LTI") compensation for the year 2012. (*Id.* ¶ 65.) Ghorpade received neither. (*Id.* ¶ 70.)

By late 2012, Townsend and other MetLife executives came to believe that Relan was not a suitable CEO and that a reorganization of MetLife India's leadership structure was necessary. (*Id.* ¶¶ 42, 44, 83, 86-90.) Ghorpade proposed that the position of non-executive chairman (the position he held) and the position of CEO (the position Relan held) be consolidated into one job, and proposed that he should assume the new role. (*Id.* ¶ 96.) Ultimately, Tarun Chugh, a man fifteen years Ghorpade's junior, was hired as CEO of MetLife India. (*Id.* ¶¶ 113, 129-131; Dkt. No. 64 at 12; Dkt. No. 63-39.)

On February 28, 2014, Townsend informed Ghorpade that he would be terminated. (Dkt. No. 62 ¶ 129.) Following Ghorpade's departure, Townsend would assume the duties of non-executive chairman of the India business. (*Id.* ¶ 131.)

Ghorpade commenced this action against MetLife and Townsend on June 17, 2014. (Dkt. No. 1.) MetLife and Townsend moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss certain of Ghorpade's claims: those under the New York State Human Rights Law, New York City Human Rights Law, and the New Jersey Law Against Discrimination. (Dkt. No. 16.) Townsend also moved to dismiss all claims against him under Federal Rule of Civil Procedure 12(b)(2). (*Id.*) The Court granted the 12(b)(6) motion, and because these were the only claims pleaded against Townsend, his motion to dismiss on personal jurisdiction grounds was denied as moot. (Dkt. No. 26 at 6.)

On February 2, 2016, MetLife filed for summary judgment on Ghorpade's remaining ERISA and ADEA claims. (Dkt. No. 52.)

## II.   Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In determining whether a genuine dispute of material fact exists, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 79-80 (2d Cir. 2009) (quoting *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).

A. Age Discrimination

Claims brought under the ADEA are subject to the familiar burden-shifting framework set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105-06 (2d Cir. 2010).  "Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination."  *Id.* at 106 (citing *McDonnell*, 411 U.S. at 802).  If the plaintiff does so, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell*, 411 U.S. at 802.

"Once such a reason is provided, the plaintiff can no longer rely on the *prima facie* case," *Gorzynski*, 596 F.3d at 106 (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008)), and instead "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor," *id.* (quoting *Gross*, 557 U.S. at 180 (internal quotation marks omitted)).  The "but-for" cause requirement means that the adverse employment action would not have occurred absent consideration of the plaintiff's age, not that the plaintiff's age was the employer's only consideration.  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014).

1.      *Prima Facie* Case

A plaintiff's burden of establishing a *prima facie* case is "not a heavy one."  *Gorzynski*, 596 F.3d at 107; *see Leibowitz v. Cornell Univ.*, 584 F.3d 487, 503 (2d Cir. 2009) (characterizing the burden as "minimal").  To make his showing, Ghorpade need only establish that (1) he was "within the protected age group"; (2) he "was qualified for the position; (3) he "experienced adverse employment action"; and (4) "such action occurred under circumstances giving rise to an inference of discrimination."  *Gorzynski*, 596 F.3d at 107.

MetLife argues that Ghorpade cannot meet his burden as to the fourth element because he has not demonstrated that decisions regarding his compensation and termination occurred under circumstances giving rise to an inference of discrimination.[1]  (Dkt. No. 53 at 13-20.)  The Court's task, at this stage, is to consider "whether a finder of fact could reasonably determine that [Ghorpade] has proffered evidence of circumstances supporting an inference of discrimination."  *Delville v. Firmenich, Inc.*, 920 F. Supp. 2d 446, 460 (S.D.N.Y. 2013).  In making this determination, the Court must "examine the record as a whole" rather than view

---

[1] MetLife separately argues that Ghorpade cannot show that he was qualified for the position of CEO of MetLife India, and thus that Ghorpade has failed to establish a different element of his *prima facie* case. (Dkt. No. 53 at 19-20.)  "[T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.'" *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (second alteration in original) (quoting *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)); *see Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001).  Indeed, the Second Circuit has "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory*, 243 F.3d at 696.  Because Ghorpade had already been assigned by MetLife to oversee its India business prior to being passed over for the role of CEO, and MetLife's contention that Ghorpade was not qualified to be CEO is more properly considered as part of its showing of legitimate, non-discriminatory reasons, a finder of fact could reasonably determine that Ghorpade was qualified for the position of MetLife India CEO.  Summary judgment on this basis is therefore unwarranted.

each piece of evidence in isolation. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).

Mindful that his burden at this stage is "minimal," the Court concludes that Ghorpade has sufficiently demonstrated circumstances giving rise to an inference of discrimination to preclude summary judgment on that basis. *Leibowitz*, 584 F.3d at 503. Courts routinely find that an ADEA plaintiff has carried her *prima facie* burden by showing that she was passed over in favor of, or replaced by, a significantly younger person. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination."); *see also D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (noting that a difference in age of eight years between plaintiff and a person to whom an open position was offered was enough to support an inference of discrimination); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 79 (2d Cir. 2005).

Because he carries only a *de minimis* burden at this stage, and Ghorpade was passed over for the position of CEO in favor of a younger person and subsequently terminated, a finder of fact could reasonably determine that Ghorpade has proffered evidence of circumstances supporting an inference of discrimination. The parties agree that Ghorpade served as the non-executive chairman of MetLife India beginning in 2007. (Dkt. No. 62 ¶¶ 2, 4.) In 2012, Ghorpade moved to India and assumed a role that focused on overseeing MetLife's India business.[2] (*Id.* ¶¶ 18-19.) At this time, Rajesh Relan was the CEO of MetLife India. (Dkt. No. 62 ¶¶ 21-22, 38.) By late 2012, Townsend—then President of MetLife's Asia region and

---

[2] Although Ghorpade contends that he was told "he would be appointed the Chief Executive Officer (CEO) of [MetLife India]" as a part of his relocation and new focus on the India business, the deposition testimony cited in support of this claim suggests that Ghorpade was told only that he would "manage the India business." (Dkt. No. 62 ¶ 18; Dkt. No. 63-1 at 45-46; Dkt. No. 63-2 at 88.) In fact, the testimony of Khalaf indicates that there was no plan or promise to make Ghordape CEO of MetLife India. (Dkt. No. 63-2 at 42-43, 47.)

Ghorpade's manager—and other MetLife executives believed that Relan was not a suitable CEO and that a reorganization of MetLife India's leadership structure was necessary. (*Id.* ¶¶ 42, 44, 83, 86-90.)  Ghorpade proposed that the position of non-executive chairman (the position he held) and the position of CEO (the position Relan held) be consolidated into one position, and proposed that he should assume the new role.  (*Id.* ¶ 96.)  Ultimately, Tarun Chugh, a man fifteen years Ghorpade's junior, was hired as CEO of MetLife India and Ghorpade was terminated from the company.  (*Id.* ¶ 113, 129-131; Dkt. No. 64 at 12; Dkt. No. 63-39.)

Although he need not have in order to meet his burden, Ghorpade has also alleged additional circumstances, detailed above, that could give rise to an inference of discrimination. Accordingly, MetLife is not entitled to summary judgment on the basis that Ghorpade has failed to establish his *prime facie* case.

### 2. Legitimate Non-Discriminatory Rationale

Because Ghorpade has established a *prima facie* case of discrimination, the burden shifts to MetLife to articulate legitimate, non-discriminatory reasons for its actions.

First, MetLife contends that it was not motivated by age when it declined to select Ghorpade for the role of CEO of MetLife India, but rather that it determined that Ghorpade was not the ideal candidate for the role based on his "shortcomings as a leader."  (Dkt. No. 53 at 20-21.)  Townsend testified that he observed Ghorpade as having a "lax communication style" in negotiations and that he viewed Ghorpade as not being "hands-on" in his management style. (Dkt. No. 55-4 at 96-98.)  Specifically, Townsend recalled an occasion on which Ghorpade presented business projections to him only to significantly revise the projections two weeks later. (*Id.* at 97-98.)  Townsend took this reversal to indicate that Ghorpade did not "know enough about what went into the projection" and said that it "raised a flag . . . in terms of [Ghorpade's] ownership of the business overall."  (*Id.* at 98.)

Moreover, upon becoming Ghorpade's manager, Townsend received an evaluation of Ghorpade from Michael Khalaf, the person who had previously supervised Ghorpade. (Dkt. No. 62 ¶¶ 44-61.) This evaluation rated Ghorpade as "Not Fully Contributing"—the lowest performance rating. (*Id.* ¶¶ 48-50.) The evaluation detailed that MetLife India's "[s]ales performance fell significantly short" and that "management must take responsibility given the magnitude and extent of the negative variance" below expectations. (*Id.* ¶ 51; Dkt. No. 55-7.) Further, it stated that there was evidence of "a lack of adequate oversight and governance (driven by a hands off approach) and this must be addressed going forward." (Dkt. No. 55-7 at 49.) It also noted that it had been "difficult to obtain complete, accurate and reliable information out of India." (*Id.*)

MetLife has provided ample support for its position that Townsend viewed Ghorpade as a flawed candidate for CEO of MetLife India because of his performance and management style—factors wholly unrelated to his age. Moreover, Tarun Chugh, the person ultimately hired for the position of CEO, had more experience in the financial services sector in India than Ghorpade and, on this basis, could have been considered a more desirable candidate for the position for reasons unrelated to Ghorpade's perceived flaws. (Dkt. No. 55-9 at 9, 37.)

Second, MetLife contends that the decision to terminate Ghorpade was made because "his position [became] unnecessary to the leadership structure of the India business" rather than because of his age. (Dkt. No. 53 at 21.) As Ghorpade himself testified, the position of non-executive chairman of MetLife India was "not a full-time position." (Dkt. No. 55-1 at 172.) Indeed, Ghorpade proposed to Townsend that the position be consolidated with the job of CEO. (*Id.* at 172-173; Dkt. No. 55-8 at 22.) After hiring Chugh as the new CEO, Townsend testified that he informed Ghorpade that MetLife India "would no longer need that full-time, nonexecutive Chairman role." (Dkt. No. 55-4 at 117.) With this, MetLife has satisfied its

burden of coming forward with a legitimate, non-discriminatory basis for Ghorpade's termination—namely, that his position was no longer needed at the company.

Third, MetLife argues that its decision not to award Ghorpade certain bonuses was motivated by business considerations unrelated to his age. Ghorpade points to the fact that he received no 2012 bonus while younger employees did as evidence that he was discriminated against on the basis of his age. (Dkt. No. 64 at 15-16.) Specifically, Ghorpade notes that the younger Relan received a bonus despite the fact that he, like Ghorpade, received a "Not Fully Contributing" ("NFC") rating on his evaluation. (Dkt. No. 62 ¶¶ 75-77.) The parties agree that the 2012 guidelines governing bonus compensation in MetLife's Asia region "expressly stated than an employee receiving a rating of NFC would receive no bonus absent a sufficient rationale provided as to why an exception should be made." (*Id.* ¶ 69.) Therefore, under the guidelines, the only way for either Relan or Ghorpade to receive a bonus in spite of this performance rating was for an exception to be requested and approved. (*Id.*; Dkt. No. 55-7 at 62.) Critically, the reason that Relan received a bonus is that Ghorpade, who supervised Relan, drafted an exception request on his behalf and strongly advocated that Relan receive a bonus. (Dkt. No. 55-9 at 20-22.) In requesting an exception for Relan, Ghorpade noted that the request for a bonus was "inconsistent with [Relan's] rating." (*Id.* at 21.) As no request for an exception was made on Ghorpade's behalf, he did not receive a bonus. Because Ghorpade was denied a bonus pursuant to a general policy, MetLife has met its burden of showing a legitimate, non-discriminatory basis for its decision not to award Ghorpade a 2012 bonus.[3]

---

[3] In his Local Rule 56.1 Counterstatement, Ghorpade appears to dispute that he was subject to 2012 Asia Compensation Guidelines. (Dkt. No. 62 ¶ 71.) Instead, he suggests that he should have been subject to guidelines for the EMEA region, "if in fact there were different guidelines" for that region. (*Id.*) Ghorpade does not, however, produce any evidence that these alternative guidelines existed or suggest how these hypothetical guidelines might have differed. Moreover, because MetLife India was in the Asia region at the time the bonus was awarded, there is no

Ghorpade also claims that he was discriminated against when he did not receive Long-Term Incentive (LTI) compensation in February 2014.  (Dkt. No. 64 at 16.)  MetLife counters that "LTI is a *long-term* compensation award designed to support the retention of an individual and provided in anticipation of expected future performance" and it was already planning not to retain Ghorpade at the time it decided not to award him an LTI.  (Dkt. No. 53 at 20; Dkt. No. 62 ¶ 73; Dkt. No. 68-4 at 20.)  In other words, Ghorpade was not awarded a retention incentive because he would not be retained.  Ghorpade, for his part, argues that "this rationale is belied by Townsend's approval of a 2012 LTI award for Rangan, who Townsend determined in January 2013 would be terminated."  (Dkt. No. 64 at 16.)   However, as MetLife points out, the comparison to Rangan is inapt because it was Ghorpade—to whom Rangan reported—who handled Rangan's compensation package and departure from the company.  (Dkt. No. 67 at 2.)  In particular, Ghorpade recommended to Townsend that Rangan receive an LTI award.  (Dkt. No. 63-15 a43.).  In contrast, Ghorpade reported to Townsend.  And Ghorpade has failed to submit any evidence that Townsend treated similarly situated subordinates different as it relates to LTI compensation.  (Dkt. No. 67 at 2.)  MetLife has more than satisfied its burden of coming forward with a legitimate basis for not giving Ghorpade the LTI award.

To the extent that Ghorpade objects to other actions taken by MetLife, these are addressed below.

### 3.     But-For Cause

MetLife having produced evidence that it acted for non-discriminatory reasons, Ghorpade may no longer rely on his *prima facie* case.  *Gorzynski*, 596 F.3d at 107.  Rather, the Court must

---

reason to conclude that guidelines for compensation in Asia would not have controlled Ghorpade's compensation. (Dkt. No. 62 ¶¶ 43-44.)  Finally, Ghorpade elsewhere appears to concede that the Asia guidelines applied to him. (Dkt. No. 62 ¶ 66.)

determine whether Ghorpade has "raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause" of MetLife's actions. *Id.; see also Delaney,* 766 F.3d at 168-69; *Holcomb*, 521 F.3d at 141.

Ghorpade offers a range of arguments for his position that MetLife's proffered justifications are pretextual and that the firm acted with a discriminatory motive. First, he contends that he was not a "hands off" as a manager, and thus he could not have been passed over for the job of CEO for this reason. (Dkt. No. 64 at 18.) Whether Ghorpade was in fact a poor manager or an exceptional one is not, strictly speaking, the question. The Court's role "is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Byrnie*, 243 F.3d at 103 (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10 Cir. 1999)). Error in estimating Ghorpade's performance as a manager is not, without more, evidence that he was discriminated against on the basis of his age. *See Geras v. Hempstead Union Free Sch. Dist.*, No. 13-CV-5094, 2015 WL 9182980, at *20 (E.D.N.Y. Dec. 17, 2015). That said, a plaintiff may undermine an employer's proffered explanation by pointing to evidence that the explanation lacks "credibility." *Byrnie*, 243 F.3d at 105.

In Ghorpade's view, Townsend's claim that Ghorpade was too hands off is not credible because Townsend was aware of Ghorpade's efforts to become more involved in the operations of the business. (Dkt. No. 64 at 19.) However, Townsend was not the only person to evaluate Ghorpade as lacking in this regard. Indeed, Khalaf cited a "lack of adequate oversight and governance (driven by a hands off approach)" in his draft performance review of Ghorpade. (Dkt. No. 55-7 at 49.) As Khalaf was the same person who had recently asked Ghorpade to move to India and focus his efforts on managing the India business (Dkt. No. 62 ¶ 18), it is particularly unlikely that his estimation of Ghorpade's management ability was motivated by

age-related bias.[4] *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 24-25 (E.D.N.Y. 2015) (discussing the "same-actor inference," which stands for the related notion that "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." (internal citation and quotation marks omitted)). Moreover, Ghorpade does not dispute that he significantly revised business projections after presenting them to Townsend, but suggests that the revision did not reflect Ghorpade's overall "approach to business," as Townsend concluded. (Dkt. No. 64 at 18.) Because the question is not whether Townsend drew a wise conclusion about Ghorpade's abilities, but whether Townsend's proffered explanations were a pretext to conceal age discrimination, Ghorpade cannot avoid summary judgment on this basis.

Next, Ghorpade argues that pretext can be inferred from the fact that MetLife "did not sincerely search for other opportunities within MetLife for Ghorpade" but rather seemed intent on letting him go. (*Id.* at 23-24.) Whether the search to find Ghorpade an alternative position within the company was sweeping or cursory is immaterial so long as the nature of that search was untainted by discriminatory motivation. The idea that the company's failure to find an alternate position for Ghorpade signals age-related bias is undermined by evidence that Ghorpade himself was involved in a similar process to find an alternative position for Rangan, a younger executive, the failure of which also resulted in Rangan's exit from the company. (Dkt. No. 68-1 at 4-6.) As a high-level executive, the task of finding Ghorpade a new position with the

---

[4] Ghorpade also contends that his performance review was primarily the work of Khalaf and that the report contained "material inaccuracies." (Dkt. No. 64 at 21-22.) As has been discussed, the fact that Khalaf was critical to the performance review cuts against any finding that the review was motivated by age-based bias. And inaccuracy in an evaluation alone is insufficient to create a genuine issue of fact as to whether Ghorpade's age was the but-for cause of the challenged actions.

company was deemed difficult. (Dkt. No. 55-9 at 24.) Moreover, MetLife employees initially tasked with searching for another opportunity inside the company were subsequently told that they need not "shop around," in part because of Ghorpade's performance issues—a consideration unrelated to his age. (Dkt. No. 55-9 at 24.)

Ghorpade also contends that evidence of discriminatory bias can be found in MetLife employees' seeming "preoccupation with Ghorpade's age and retirement eligibility." (Dkt. No. 64 at 12-14.) To be sure, MetLife personnel referenced Ghorpade's eligibility for retirement in discussing his exit from the company. (*See* Dkt No. 63-1 at 2; Dkt. No. 68-5 at 2.) However, all indications are that discussion of Ghorpade's eligibility for retirement was designed to *benefit* Ghorpade. For instance, Merianna Lok, the head of Human Resources for Asia, wrote that she wanted to look into Ghorpade's eligibility for early retirement and indicated that the timing of Ghorpade's exit could be altered so that he would be "eligible for his retirement benefits." (Dkt. No. 68-5 at 2.) Similarly, Townsend wrote to Lok asking for "the definitive position" as to Ghorpade's eligibility for retirement to "ensure that he is able to obtain full benefits." (Dkt. No. 68-6 at 2.) At most, the fact that Ghorpade was eligible for retirement was discussed as a reason why his exit would be on generous terms, and why there was a less pressing need to find Ghorpade an alternative position within the company because he was ensured retirement compensation. (*See* Dkt. No. 55-9 at 24.) Discussion of retirement eligibility in the workplace is "common . . . and is typically unrelated to age discrimination." *Hamilton v. Mount Sinai. Hosp.*, 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007); *see also Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) ("[A]n employer's concern about the economic consequences of employment decisions does not constitute age discrimination under the ADEA, even though there may be a correlation with age." (citing *Hazen Paper co. v. Biggins*, 507 U.S. 604, 611-12 (1993))). Here,

Ghorpade has failed to offer evidence sufficient for a reasonable jury to conclude that MetLife's interest in Ghorpade's eligibility for retirement reflected age-related bias.

For the same reason, the fact that MetLife tracked the age of its executives is not evidence of discriminatory bias where, as here, the evidence indicates that the company did so as a part of "succession planning" rather than to aid discrimination.  *Crowe v. Leroy Cent. Sch. Dist.*, 949 F. Supp. 2d 435, 446 (W.D.N.Y. 2013).  The record reflects that MetLife collected such information so that it would be aware of whether it was at risk of a significant portion of its leadership choosing to retire at one time, thereby impeding the company's ability to manage leadership transitions in an orderly manner.  (Dkt. No. 55-6 at 30-31.)  Although "[i]nternal documents" suggesting that a company is "preoccupied with the ages of its" employees and has "a strong desire to increase the percentage" of younger employees in its employ can suffice to create an inference of discrimination, *Delville*, 920 F. Supp. 2d at 460, here Ghorpade has failed to submit evidence to suggest that MetLife was interested in the age of its employees for any reason other than permissible concerns about orderly succession.

Finally, as has already been discussed, neither MetLife's decision to hire the younger Chugh as CEO of MetLife India, nor its decision to refrain from awarding Ghorpade a 2012 bonus and 2013 LTI, suffice to preclude summary judgment.[5]

---

[5] Although he does not raise it in support of his claim that age was the but-for cause of MetLife's actions, Ghorpade elsewhere cites statistical evidence purporting to show that Townsend made a trend of terminating older employees and hiring younger ones.  (Dkt. No. 64 at 17.)  Specifically, Ghorpade contends that "Townsend had involuntarily terminated five individuals" with an "average age . . . of 54.02 years" by the time Ghorpade's termination was effective, whereas he "hired 11 people since joining MetLife" with an average age of "approximately 46.1 years." (Dkt. No. 62 ¶¶ 547-48.)  To begin with, Ghorpade's characterization of the evidence is suspect, as one of the employees Ghorpade classifies as "involuntarily terminated" appears to have left the company of his own accord, and the decision not to retain another such employee was not made by Townsend.  (Dkt. No. 55-4 at 47, 50-51.)  In any event, even if Ghorpade had raised this statistical evidence in support of his argument as to but-for cause and the Court was prepared to credit it as presented, a small-sample-size analysis showing little more than a correlation

Even considering all of his evidence together and in the light most favorable to him, Ghorpade has failed to create a genuine dispute of material fact as to whether his age was the but-for cause of the challenged actions. *See Delaney*, 766 F.3d at 169. Accordingly, MetLife is entitled to summary judgment on Ghorpade's ADEA claim.

### B. ERISA

Ghorpade also maintains that he was wrongfully terminated in violation of Section 510 of ERISA, which makes it "unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]." 29 U.S.C. § 1140. Specifically, Ghorpade claims that he was terminated so that MetLife could prevent him from becoming eligible for greater retirement benefits. (Dkt. No. 64 at 24-26.)

"To succeed on a Section 510 claim, a plaintiff must demonstrate the employer specifically intended to interfere with benefits." *Berube v. Great Atl. & Pac. Tea. Co.,* 348 F. App'x 684, 687 (2d Cir. 2009) (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990)). Indeed, "there is . . . no cause of action under [S]ection 510 where the loss of pension benefits 'was a mere consequence of, but not a motivating factor behind, a termination of employment.'" *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997) (quoting *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988)). Thus, "[t]o defeat summary judgment" a plaintiff must "adduce some evidence from which a reasonable jury could conclude that [the defendant] terminated his employment with the intent to reduce his pension benefits." *Id.*

---

between age and employment decisions would be insufficient to create a genuine dispute of material fact as to whether Ghorpade's age was the but-for cause of MetLife's actions.

Ghorpade has failed to put forward any evidence that MetLife acted with the specific intent to interfere with his benefits. Ghorpade appears to concede as much, arguing only that "there is ample evidence that [MetLife was] aware of the benefits to which Ghorpade was entitled" and was "cognizant of the fact that terminating his employment in the way [it] did would deny him such benefits." (Dkt. No. 64 at 25.) In other words, Ghorpade does little more than posit that his loss of benefits was a consequence of his termination, rather than a motiving factor behind it. Even assuming that he has established the *prima facie* case for a Section 510 claim, MetLife has, for the reasons discussed above, put forward a legitimate nondiscriminatory reason for Ghorpade's termination. Ghorpade, in turn, has not put forward facts upon which a reasonable jury could find that MetLife was motivated by a desire to deprive him of his benefits. *Cf. Dister*, 859 F.2d at 1115-17. As a consequence, MetLife is entitled to summary judgment on Ghorpade's ERISA claim.

### III. Conclusion

For the foregoing reasons, MetLife's motion for summary judgment is GRANTED.

The Clerk of the Court is directed to close the motion at docket number 52 and to close this case.

SO ORDERED.

Dated: July 20, 2016
New York, New York

_____
J. PAUL OETKEN
United States District Judge